<u>NOT FOR PUBLICATION</u> _____ [11]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :
GILBERTO PAGAN and JUDITH           :        Civil Action No. 04-1407 (FLW)
PAGAN,                              :
                                    :
              Plaintiffs,           :               **OPINION**
                                    :
       v.                           :
                                    :
TOWNSHIP OF RARITAN, THE            :
TOWNSHIP OF RARITAN                 :
POLICE DEPARTMENT,                  :
ALFRED PAYNE,                       :
                                    :
              Defendants.           :
_____     :

<u>**WOLFSON, UNITED STATES DISTRICT JUDGE**</u>

       Presently before the Court is a motion by Defendants, Township of Raritan, New Jersey

("Raritan"), The Township of Raritan Police Department ("Raritan Police"), and Raritan Police

Officer Alfred Payne ("Payne"), seeking summary judgment pursuant to <u>Fed. R. Civ. P.</u> 56, on

the Complaint of Plaintiffs Gilberto Pagan and Judith Pagan.[1]  Plaintiff alleges, pursuant to 42

U.S.C. § 1983, that Payne violated his rights under the Fourth Amendment by using excessive

force when he arrested Plaintiff after responding to a domestic violence call at Plaintiff's

residence.  Plaintiff also asserts that Raritan and Raritan Police similarly violated his Fourth

_____
[1] The individual Defendants are collectively referred to, when appropriate, as "Defendants."
Additionally, because Gilberto and Judith Pagan are a married couple and the primary focus of their
Complaint is Gilberto's § 1983 and state common law claims, I hereinafter refer to Gilberto as "Plaintiff"
and will address Judith's <u>per quod</u> loss of consortium claim separately.

1

Amendment rights by promoting a policy sanctioning the use of excessive force.  In addition,

Plaintiff asserts certain common law claims against all Defendants.

In their motion for summary judgment, Defendants argue: (1) Payne's actions did not

constitute an unreasonable use of excessive force as a matter of law; (2) Payne is entitled to

qualified immunity; (3) Raritan and Raritan Police cannot be liable under §1983 upon a theory of

respondeat superior; and (4) Judith Pagan cannot assert a loss of consortium claim based on the

constitutional rights of another.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343,

and 1367.  For the reasons that follow, Defendants' motion for summary judgment is granted in

part and denied in part.

## I.      BACKGROUND

On March 30, 2002, Raritan Township Police Officers Alfred Payne, Mitchell Ege and

Sergeant Ludwig responded separately to a domestic violence call at Plaintiff's residence.  See

Payne Dep. at 16-17.  The domestic violence call arose out of a dispute between Plaintiff's

daughter, Vivian Medina ("Vivian"), and her estranged husband, Pablo Medina ("Pablo").  See G.

Pagan Dep. at 39, 44.  According to Plaintiff, a fight involving Pablo, Vivian, Plaintiff's wife

Judith Pagan ("Judith"), and Plaintiff erupted after Pablo arrived at Plaintiff's residence to find

that Vivian had not yet prepared their daughter for Pablo's visit.  Id. at 14-15.  Plaintiff testified at

his deposition that Vivian and Judith were in the front yard of Plaintiff's residence, attempting to

calm Pablo, when Plaintiff walked outside to aid them.  Id.  According to Plaintiff, at that point

Pablo began kicking and hitting the women, and punched Plaintiff in the eye.  Id. at  31, 43.

Plaintiff testified that he attempted to defend himself against Pablo's assault, and that his son

Derrick Pagan ("Derrick") intervened and "attacked" Pablo, eventually bringing the fight to an

2

end. Id. at 40-41.

When the police arrived, the family members, with the exception of Pablo, had retreated indoors. Payne Dep. at 23.  Payne testified at his deposition that he spoke first to Pablo, who reported that he had been assaulted.[2] Id. at 24-25.  Payne, who was in uniform at the time, left Pablo with the other officers and entered Plaintiff's home to find Pablo's attacker. Id. at 28-29. Payne testified that he had difficulty communicating with the individuals in the house because of the commotion among them and because they primarily spoke Spanish.[3] Id. at 56.  After a short time, Payne went back outside the residence and spoke to Pablo again, who advised Payne that Plaintiff had assaulted him with a small bat. Id. at 44.

Payne testified that he went back into the residence to arrest Plaintiff after Pablo identified him as his assailant. Payne Dep. at 54-55.  According to Payne, as he approached Plaintiff, Vivian and Judith "began to yell and scream," which Payne characterized as "interfering with [his] investigation." Id. at 55.  Payne testified that he "advised both of them to remain quiet," but that they "became excited and began to cry and yell incoherently." Id.  Payne testified that he had begun to lead Plaintiff down a hallway in the house when "[Judith] grabbed [Payne's] arm and ripped him off from [Plaintiff]." Id.  Payne also testified that at the same time Judith grabbed him, Plaintiff pulled away from him but did not say anything. Id.  Payne then

---

[2] Payne testified that Pablo's "right eye was puffy and red," with an abrasion that extended to his forehead. Payne Dep. at 24.  Payne also testified that Pablo's shirt was torn open and that he observed scratch marks on Pablo's chest. Id.  Vivian testified that Pablo tore his own shirt off and, in doing so, likely scratched himself. V. Medina Dep. at 128-29.

[3] Payne testified that: "[it] was just hysterics.  Everyone was incoherent.  It was a lot of screaming and yelling. And I did make several attempts to quiet everyone down to speak to them...." Payne Dep. at 41-42.

advised Judith not to further interfere in Plaintiff's arrest or he would arrest her as well. Id. at 59.

Payne testified that he then tried to "gain control of [Plaintiff] and place him under arrest," but Plaintiff refused to comply with his orders and placed his hands into his pockets "making it difficult for [Payne] to handcuff him." Id.  Payne testified that Plaintiff continued to "passively resist" his orders for "a couple [of] minutes," and even walked a few steps away from Payne at one point. Id. at 60-62.  According to Payne, as he was placing handcuffs on one of Plaintiff's wrists, he "felt the weight of [Vivian] on [his] back." Id. at 62.  He also testified that Vivian grabbed his right arm, "and the additional weight" on his back coupled with the "angle that [Plaintiff] and [Payne were] at caused [Payne] to lose [his] balance and fall." Id. at 63.  Payne described the position in which he was standing as: "[f]acing [Plaintiff] sideways, I guess, towards his back with one hand, leaning into him trying to handcuff him." Id. at 65.  Payne could not remember what side of Plaintiff he was standing on at the time, nor which hand he cuffed first. Id.  When asked to describe what specifically caused him to fall, Payne replied: "[j]ust because her weight, and like I said, I was almost like - - his position, he was straightforward. I was on the side. And I just went into him, just lost my footing. [W]e were still moving down the hallway as this was all going on." Id.  Payne also suggested: "It might have been just my clumsy feet. I really - - you know."[4] Id.

_____

[4] Later in his deposition, Payne answered additional questions regarding the cause of his alleged fall:

Q.    Let me back up.  Vivian is leaning against you grabbing your arm.  You got [Plaintiff] in front of
      you and you have one hand handcuffed?
A.    One hand handcuffed.
Q.    And is it like Dominos, the weight knocks everybody down?
A.    Yes.
Q.    Do you see Vivian at any time jump on you?
A.    I don't recall. Everything was so fast.

_____Payne testified that when he fell, he landed on Plaintiff's "upper torso ... with his chest area" and "[c]ould have" landed on Plaintiff's left shoulder or the center of his back. Id. at 66. Payne could not recall if Vivian also fell, but he testified that when he regained his balance and finished handcuffing Plaintiff, she again attempted to "pull [his] arms off [of] [Plaintiff]." Id. at 67.  Payne said he again felt Vivian's weight against his back, and on his "right shoulder areas," at which time Payne grew "concerned with [his] safety" because his duty weapon was located on his right hip. Id. at 67.  Payne testified that he called for help, but that he remained focused on arresting Plaintiff and did not see what happened when Ege answered his call. Id. at 68. According to Payne, shortly thereafter he completed his arrest of Plaintiff and escorted him outside, where he secured him in a waiting patrol car. Id.

Ege also testified to the events of that day at his own deposition.  He testified that when he entered Plaintiff's residence he observed Payne attempting to handcuff Plaintiff.[5] Ege Dep. at 38.  According to Ege, Plaintiff "was putting up passive resistence" to Payne's efforts "[b]y not putting his hands behind his back" and, instead, "keeping them to himself." Id. at 38-39.  Ege also testified that "[t]here was a lot of confusion in the house that afternoon" and that "emotions were running high and people were hollering a lot" but that he had no recollection of "who was hollering what at any given moment." Id. at 40.  Ege also testified that Vivian and Judith were

----

....
Q.      So, again, I don't want to repeat the same question, it is really she leans on you, which causes
        you to lean on [Plaintiff], and everybody falls?
A.      I just lost my footing from the angle we were at while I'm trying to make the arrest.

Payne Dep. at 63-64.

[5] Ege could not recall Plaintiff's height or weight, but he described Payne as approximately six feet tall  and "[o]ver two hundred pounds." Ege Dep. at 39.

5

interfering with Payne's arrest of Plaintiff by "grabbing [Payne] and trying to prevent him from arresting [Plaintiff]." Id. at 41.  However, according to Ege, Derrick, followed the officers' instructions to stay in the kitchen out of the way of their activities. Id. at 50.

Ege testified that Vivian was "very upset" and was "yelling and screaming" but that he could not recall what she was saying. Id. at 42.  According to Ege, after Payne and Plaintiff had walked down a hallway toward the foyer of the house, Vivian "jumped on [Payne's] back" as Payne was attempting to handcuff Plaintiff, causing all three to fall to the ground.[6] Id. at 45-46. Ege testified that Payne landed on top of Plaintiff's back, but that he "didn't witness any one of them in particular hit the ground" because they fell so quickly. Id. at 48.  Ege guessed that Payne landed on Plaintiff's back because "[Plaintiff] had his back to [Payne] when [Payne] was trying to effectuate the arrest and Vivian came in." Id. at 49.  Ege testified that he then pulled Vivian off of Payne and arrested her. Id.  50-51.  He added that because his attention was focused on Vivian, he did not "witness anything that [occurred] between [Payne] and [Plaintiff]." Id. at 51.

Plaintiff offered a conflicting account of what happened that day.  At his deposition, he testified that after Payne came into the house for the second time:

> [Judith] was trying to talk to [him], and he didn't let her tell him anything. He ...  was saying who hit [Pablo] outside ... that's when I [asked Payne to] let my daughter, [Vivian,] ...  explain to [him] what is happening even [if] [Payne's] not going to understand. That's when [Payne] took my arm and he twist it. And he put, put the leg behind and he threw me against the wall.
>
> I kept on rolling to the front door, until getting to the dining room, that's when he picked

---

[6] When questioned about the precise nature of Vivian's purported jump, Ege could not recall whether Vivian jumped directly onto Payne's back or from the side, or whether she jumped onto the left side, right side, or middle of Payne's back. Ege Dep. at 46. Later, Ege grew unsure about whether Vivian jumped onto Payne's back at all, and testified: "I belive it was more of a forceful running into him, grabbed him type situation," which he described as "[p]retty much" like a bear hug. Id. at 47.

me up, took my arm, threw me against the floor, put all of his weight on top of me, like if I was a criminal.

G. Pagan Dep. at 42.

Plaintiff's wife, Judith, also offered an account of Plaintiff's arrest that contradicted

Payne's version.  In her deposition she testified:

When [Payne] came back to the house he came with his hands on his pistol with a different face. And then he said, 'who is the one who hit the man outside?' And he pointed his finger at my husband and said, 'You were.'

He grabbed [Plaintiff] by the arm. He grabbed him by the arm and threw him against the house wall.  And I want to mention that my husband is short and not thick. [Payne] threw him against the dining room [wall] of the house.

I was telling him, 'Listen to our version.  Why don't you listen to us,' in English and Spanish. And my daughter [Vivian] was screaming. My son [Derrick] was screaming at [Payne].  The other police officers were like in shock.

J. Pagan Dep. at 80-81.

Plaintiff's daughter, Vivian, also testified at a deposition and claimed that Payne behaved

unreasonably during his arrest of Plaintiff.  She testified:

[Payne] came through the door with his arms open and said, ' Who is the guy who hit the guy outside?' But it was really nasty and loud. ....

And he immediately walked over to my dad, [Plaintiff,] grabbed his arm and twisted it ... and kicked him to the front of the house, to the front door of the house where there is kind of a wall and kneed him in his back.

When [Payne] grabbed [Plaintiff's] arm again, it went - - you heard like a crack, and my dad screamed 'Ow, ow, ow, listen to me.'

V. Medina Dep. at 94-95.  Vivian admitted that she touched or tapped Payne on his right

shoulder in an effort to get his attention and convey to him her version of the events of the day,

7

but that she did so only after Payne knocked Plaintiff to the ground.[7] <u>Id.</u> at 95.

After his arrest, Plaintiff complained of severe shoulder pain and was transported to the Hunterdon Medical Center where he was diagnosed with a right shoulder joint separation, tendon tear in the right biceps, posterior neck pain, disc herniation at C6-7, and damage to his rotator cuff. G. Pagan Dep. at 59.  Plaintiff later underwent surgery for his injuries. <u>See</u> Ex. F. to Arleo Cert.  After examining certain medical evidence and transcripts of the deposition testimony of Plaintiff, Judith, Vivian, Payne and Ege, Dr. Robert C. Pertrucelli, Plaintiff's medical expert, opined, among other things, that Plaintiff's injuries were "most definitely consistent with a twisting" as described by Plaintiff. <u>See</u> Ex. G. to Arleo Cert.  Plaintiff testified that his injuries have left him unable to work, and suffering from depression. G. Pagan Dep. at 63, 75, 77.

On March 25, 2004, Plaintiff filed a Complaint against Defendants in which he alleges, pursuant to § 1982, that Payne violated his rights under the Fourth Amendment by using excessive force when he arrested Plaintiff.  Plaintiff also asserts that Raritan and Raritan Police similarly violated his Fourth Amendment rights by promoting a policy sanctioning the use of excessive force, which policy Plaintiff claims is evidenced by their failure to discipline Payne or his fellow officers for the alleged use of excessive force against Plaintiff.  In addition to his § 1982 claims, Plaintiff also asserts against state common law claims for assault, negligence, and intentional and/or negligent infliction of emotional distress.

In August 2004, Defendants filed their Answer, Counterclaim, and a Third-Party Complaint.  In the Counterclaim, Payne asserts a common law assault claim against Plaintiff

---

[7] Vivian was ultimately restrained by Ege, who pulled her away from Payne by the hair, handcuffed her, and secured her in one of the patrol cars parked outside of Plaintiff's residence. <u>See</u> V. Medina Dep. at 95-96; Ege Dep. at 50-51.

arising out of Plaintiff's alleged resistence to Payne's attempt to arrest him.  Also, in a Third-Party Complaint, the Township of Raritan and Payne assert a similar claim for contribution against Vivian Medina, and Payne separately asserts a common law assault claim.  On January 13, 2006, Defendants filed this motion seeking summary judgment on Plaintiff's Complaint.

## II.   DISCUSSION

### A.   Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To do so, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### B.   Excessive Force

In this motion for summary judgment, Payne argues that the amount of force he used to effect Plaintiff's March 30, 2002 arrest was reasonable under the circumstances.  Alternatively,

he argues that he is entitled to qualified immunity from Plaintiff's § 1983 and other claims.[8]   The

Fourth Amendment protects citizens from use of excessive force by governmental officials. "To

state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a

plaintiff must show that a 'seizure' occurred and that it was unreasonable." Estate of Smith v.

Marasco, 318 F.3d 497, 515 (3d Cir. 2003) (quoting Abraham v. Raso, 183 F.3d 279, 288 (3d

Cir.1999)).  The test of reasonableness under the Fourth Amendment is whether, under the

totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the

facts and circumstances confronting them, without regard to their underlying intent or

motivations."[9] Graham v. Connor, 490 U.S. 386, 397 (1989).  Thus, if a use of force is

objectively unreasonable, an officer's good faith is irrelevant; likewise, if a use of force is

objectively reasonable, any bad faith motivation on the officer's part is immaterial. See Abraham,

183 F.3d at 289.  In all cases, "[t]he 'reasonableness' of a particular use of force must be judged

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." Graham, 490 U.S. at 396-97.  Further, the "calculus of reasonableness must embody

---

[8] 42 U.S.C. § 1983 provides a private cause of action against any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States.  The statute, in and of itself, is not a source of substantive rights but provides " a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989).  To assert a § 1983 claim, a plaintiff must allege that the defendant, "acting under color of State law," deprived him of a right secured by the Constitution and laws of the United States. West v. Atkins, 487 U.S. 42, 48 (1988); Natale v. Camden County Correctional Facility,318 F.3d 575, 580-81 (3d Cir. 2003).  Here, Payne does not dispute that he acted under color of state law in effecting Plaintiff's arrest.

[9] Among the specific factors a court will consider in making a determination of reasonableness are: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; (3) whether he actively is resisting arrest or attempting to evade arrest by flight; (4) the possibility that the person is violent or dangerous; (5) the duration of the action; (6) whether the action takes place in the context of effecting an arrest; (7) the possibility that the suspect may be armed; and (8) and the number of persons with whom the police officers must contend at one time. See Estate of Smith v. Marasco, 318 F.3d 497, 515-16 (3d Cir. 2003).

allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id.  Finally, although "reasonableness under the Fourth Amendment should frequently remain a question for the jury," Abraham, 183 F.3d at 290, "'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances,'" Id. (quoting  Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994)).

Cases involving § 1983 claims against police officers often raise questions of whether the officer is entitled to qualified immunity.  Government officials performing discretionary functions are generally entitled to qualified immunity. See Wilson v. Layne, 526 U.S. 603, 609 (1999).  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Saucier v. Katz, 533 U.S. 194, 200 (2001) (quotation and citation omitted).  The Supreme Court has emphasized that it is  "an immunity from suit rather than a mere defense to liability." Id. (quotation and citation omitted).  Even so, a government official has the burden of establishing that he is entitled to such immunity. See Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).

Consideration of a qualified immunity defense involves a two-step inquiry.  First, a court must examine whether or not the alleged conduct, taken in the light most favorable to the plaintiff, violated a constitutional right. Saucier, 533 U.S. at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Id.  If the allegations amount to the violation of a constitutional right, the court must proceed to the second inquiry and determine if the right was

"clearly established in the specific context of the case." See Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam); see also Saucier, 533 U.S. at 202 (noting that an officer is entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").  To determine if the law was clearly established, a court must examine "whether the state of the law at the time the violation occurred" gave defendants "fair warning that their alleged treatment [of the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002); see also Williams v. Bitner, 455 F.3d 186, 191 (3d Cir. 2006).

Here, viewing the evidence in a light most favorable to Plaintiff, as I must on Defendants' motion for summary judgment, I find a material dispute of fact as to whether Payne's use of force to arrest Plaintiff on March 30, 2002, was excessive.  If true, the testimony of Plaintiff and his witnesses establishes that Payne entered Plaintiff's home that evening, refused to make any effort to discern the events that had given rise to the domestic disturbance call to which he was responding, grabbed and twisted Plaintiff's arm, threw Plaintiff to the ground without provocation or explanation, and drove his weight into Plaintiff's back, causing severe injuries to Plaintiff's left shoulder.  I am satisfied that a reasonable jury could conclude that such conduct constitutes the use of excessive force, especially given Plaintiff's testimony that he did not resist Payne's efforts to arrest him, and Payne's own testimony that Plaintiff exhibited only "passive resistance."[10]

_____

[10] Payne argues that he was under no duty to cease his efforts to arrest Plaintiff and that the use of force in response to Plaintiff's initial refusal to cooperate was justified.  While that argument may have merit, the relevant question at this stage is whether the *amount of force* Payne elected to use was reasonable under the circumstances.  While Pablo alleged that Plaintiff assaulted him with a small bat, there is no clear evidence in the record that such an assault occurred.  Indeed, Payne observed only

I also find that Payne is not entitled to qualified immunity with respect to his alleged

conduct during his March 30, 2002 arrest of Plaintiff.  Assuming the truthfulness of Plaintiff's

testimony and that of his witnesses, Payne's alleged conduct could be construed to violate

constitutional rights of which a reasonable person would have known, namely, the right to be free

from the use of excessive force in making an arrest. See, e.g., Couden v. Duffy, 446 F.3d 483,

497 (3d Cir. 2006) (finding excessive force as a matter of law where there was no evidence that

plaintiff "was resisting arrest or attempting to flee"); Champion v. Outlook Nashville, Inc., 380 F

.3d 893, 903 (6th Cir. 2004) ("[I]t also clearly established that putting substantial or significant

pressure on a suspect's back while that suspect is in a face-down prone position after being

subdued and/or incapacitated constitutes excessive force.").  It is for a jury to decide the

"disputed historical facts material to the qualified immunity question." Carswell v. Borough of

Homestead, 381 F.3d 235, 242 (3d Cir. 2004) (citing Sharrar v. Felsing, 128 F.3d 810, 828 (3d

Cir. 1997)).  Accordingly, in light of the disputed facts presented here, I cannot hold as a matter

of law that Payne is entitled to qualified immunity.  Consequently, Payne's motion for summary

judgement with respect to Plaintiff's § 1983 claim is denied.

1.     **Municipal Liability under § 1983**

Plaintiff also asserts that Raritan and Raritan Police are liable for Payne's alleged

violation of his constitutional rights.  Plaintiff argues that liability should be imposed on Raritan

---

superficial scratches on Pablo's face and chest when he arrived on the scene.  Additionally, there is no
evidence that Plaintiff wielded a weapon of any sort, or otherwise presented an immediate threat to Payne
or the other officers.  Further, the size differential between Plaintiff and Payne is also worth noting.
Finally, while there is inherent risk associated with instances in which officers respond to a scene at
which they are outnumbered by those present, in this case, Plaintiff's son, Derrick, obeyed officers'
orders to keep his distance, resulting in a one to one ratio of remaining occupants in the residence and
police officers.

and Raritan Police because both were aware of Raritan Police's hiring, training, and supervisory policies, customs, and practices and the likelihood that they would result in a violation like that which befell Plaintiff.  Local government units and supervisors are not liable under § 1983 solely on a theory of <u>respondeat</u> <u>superior</u>. <u>See</u> <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 824 n.8 (1985); <u>Monell v. Dept. of Social Services,</u> 436 U.S. 658, 691-95 (1978).   Rather, such entities may be "liable for any constitutional deprivations . . . only if 'there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" <u>Brown v. Muhlenberg Township</u>, 269 F.3d 205, 214 (3d Cir. 2001) (quoting <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989)). Consequently, a governmental entity may be liable in a § 1983 action in one of two ways.  First, "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 121 (1988) (quoting <u>Monell</u>, 436 U.S. at 690). Second, liability may also be found if there is a "causal link between the constitutional deprivation and a custom, 'even though such a custom has not received formal approval through the body's official decision making channels.'" <u>Brown</u>, 269 F.3d at 215 (quoting <u>Monell</u>, 436 U.S. at 690-91).

Here, Plaintiff presents no affirmative evidence of the existence of a policy or custom observed formally or informally by Raritan or Raritan Police that can be causally linked the alleged use of excessive force about which Plaintiff complains.  Indeed, Plaintiff does not even discuss the issue directly in his opposition to Defendants' motion for summary judgment. Instead, Plaintiff addresses the matter in a brief footnote in which he asserts a novel argument with no support in Third Circuit case law.  Specifically, Plaintiff relies on <u>Grandstaff v. City of</u>

14

Borger, 767 F.2d 161, 169 (5th Cir. 1985), cert. denied, 480 U.S. 916 (1987), and argues that
Raritan and Raritan Police promoted a policy that sanctioned the use of excessive force by police
officers, and that the existence of such policy is evidence by the failure by Raritan and Raritan
Police to discipline Payne or his fellow officers after learning of Payne's alleged use of excessive
force against Plaintiff on March 30, 2002.

 In Grandstaff, the entire night shift of the police department in the City of Borger, Texas
"participated in [a] wild barrage" when it fired repeatedly on a truck that the officers thought
contained a fugitive, resulting in the shooting death of an innocent farmer. 767 F.2d at 171.  The
Fifth Circuit held that the action of the entire night shift was circumstantial evidence of a city
policy, and that a jury could base municipal liability for the plaintiff's § 1983 claims on this
inference. Id.

 This case is quite distinct from Grandstaff.  Here, the instance of misconduct on which
Plaintiff relies to establish the existence of a policy sanctioning excessive use of force by Raritan
and Raritan Police involved only one Raritan Police officer, who's alleged misconduct falls far
short in magnitude to the pervasive, egregious misconduct confronted by the Fifth Circuit in
Grandstaff.  Furthermore, as a matter of law, Plaintiff's reliance on Grandstaff is misplaced.  The
Third Circuit has not adopted the novel theory of liability in Grandstaff, nor cited the case
approvingly.  Additionally, the Fifth Circuit "expressly limited Grandstaff 'to the extraordinary
facts of the case,' declaring that [its] opinion "can be applied only to equally extreme factual
situations."  Lopez-Rodriguez v. City of Levelland, 100 Fed. Appx. 272, 274 (5th Cir. 2004)
(quoting Snyder v. Trepagnier, 142 F.3d 791, 797-98 (5th Cir. 1998).  The Fifth Circuit has since
held that it will "not infer an unconstitutional custom or policy from a municipality's failure to

discipline an officer for a single incident." See <u>Fraire v. City of Arlington</u>, 957 F.2d 1268, 1278-79 (5th Cir. 1992).

Accordingly, in the absence of any evidence establishing the existence of a policy or custom observed formally or informally by Raritan or Raritan Police that can be causally linked the alleged use of excessive force about which Plaintiff complains, Plaintiff's claims against the Raritan and Raritan Police cannot survive.  Defendants' motion for summary judgment as to Plaintiff's § 1983 claims against Raritan and Raritan Police is therefore granted.

## 2.     Loss of Consortium claim under § 1983

Defendants argue that Plaintiff Judith Pagan cannot recover for loss of her husband's companionship and society after the injuries he allegedly sustained during his March 30, 2002 arrest because § 1983 does not provide for derivative claims, such as loss of consortium.  The Third Circuit has not yet decided the issue[11] and district courts within the Circuit are split, with the majority holding that loss of consortium claims are not compensable under § 1983. <u>See, e.g.,</u> <u>Norcross v. Town of Hammonton</u>, 2006 WL 1995021, *1 (D.N.J. 2006); <u>Colburn v. City of Philadelphia</u>, 2001 WL 872960, *2 (E.D. Pa. 2001) (rejecting § 1983 claim for loss of consortium without addressing possible deprivation of plaintiff spouse's constitutional rights);

---

[11] <u>See, e.g.,</u> <u>Wiers v. Barnes</u>, 925 F. Supp. 1079, 1095 (D. Del. 1996) (noting that the Third Circuit explicitly declined to consider whether a loss of consortium claim could be recognized under § 1983 in <u>Livingstone v. North Belle Vernon Borough</u>, 12 F.3d 1205, 1215 n.10 (3d Cir. 1993) and <u>Kulwicki v. Dawson</u>, 969 F.2d 1454, 1467 and n.15 (3d Cir. 1992)).

While the Third Circuit has been silent on the question, several other circuit courts have declined to find a constitutional right to consortium. <u>See</u> <u>Shaw v. Stroud</u>, 13 F.3d 791, 805 (4th Cir. 1994) (rejecting plaintiff wife's argument that she had a substantive due process claim arising from the death of her husband); <u>Niehus v. Liberio</u>, 973 F.2d 526, 534 (7th Cir. 1992) ("The right to a husband's assistance in raking leaves is not a liberty protected by the Fourteenth Amendment."); <u>Stallworth v. City of Cleveland</u>, 893 F.2d 830, 838 (6th Cir. 1990) ("[T]the relevant jurisdictional statute, 42 U.S.C. § 1983, does not reach [plaintiff's] claim of loss of consortium.").

Ballas v. City of Reading, 2001 WL 73737 at *7 (E.D. Pa. 2001) (same); Wiers v. Barnes, 925 F. Supp. 1079, 1095 (D. Del.1996) (same); Quitmeyer v. SEPTA, 740 F. Supp. 363, 370 (E.D. Pa. 1990) (same); but see Pahle v. Colebrookdale Twp., 227 F. Supp. 2d 361, 380-81 (E.D. Pa. 2002) (permitting consortium claim under § 1983); Brodlic v. City of Lebanon, 2005 WL 2250840 *8 (M.D. Pa. 2005) (same).

To be sure, a third party lacks standing to bring claims under § 1983 for violation of the constitutional rights of another. See Norcross, 2006 WL 1995021, *1 ("Nothing in the language of § 1983 contemplates recovery by anyone other than the individual who actually suffered the privation of rights."); Pahle, 227 F. Supp. 2d at 381 ("It is well-established that a spouse . . . has no standing to raise § 1983 claims resting on violations of her husband's constitutional rights."); Estate of Cooper v. Leamer, 705 F. Supp. 1081, 1086 (M.D. Pa. 1989) ("It is clear that one may not recover damages for the violation of another's civil rights.").  However, if an individual possesses a constitutional interest in the consortium of her spouse, state action depriving her of that interest may be actionable under § 1983.  The issue, thus, becomes: whether the plaintiff spouse maintains a liberty interest in the lost consortium. See, e.g., McCurdy v. Dodd, 352 F.3d 820, 825-26 (3d Cir. 2003) (holding first issue in any case "where liberty interests are asserted as a basis for liability pursuant to § 1983," is "whether the plaintiff has alleged the deprivation of an actual constitutional right at all") (citation omitted).

In Estate of Bailey v. County of York, 768 F.2d 503 (3d Cir. 1985), overruled on other grounds by DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189 (1989), the Third Circuit held that the father of a minor child possessed a cognizable liberty interest in his child's life and physical safety, sufficient to sustain a claim for his child's death under § 1983. Id.

17

at 509 n.7.  At least two district courts have since concluded that "the rights of parents and

children recognized in the <u>Bailey</u> decision logically extend to spouses," and observed a cause of

action for "deprivation of consortium without due process of law." <u>Pahle</u>, 227 F. Supp. 2d at

380-81 ( "a spouse may assert a claim under § 1983 that the government improperly interfered

with her personal right to the services, society and companionship (i.e. consortium) of her

husband."); <u>Brodlic v. City of Lebanon</u>, 2005 WL 2250840 *8 (M.D. Pa. 2005) (same).

Recently, however, the Third Circuit distinguished <u>Bailey</u> in <u>McCurdy v. Dodd</u>, 352 F.3d

820 (3d Cir. 2003), in which it held that parents had no constitutional interest in the lives or

society of their adult children.[12]  The Third Circuit reasoned that <u>Bailey</u> was premised on a very

narrow line of Supreme Court "precedents establishing a parental interest in the care, custody,

and control of minor children." <u>Id.</u> at 826, 828 (quoting <u>Troxel v. Granville</u>, 530 U.S. 57, 65

(2000)) (noting that the "liberty interest at issue in this case -- the interest of parents in the care,

custody, and control of their [minor] children -- is perhaps the oldest of the fundamental liberty

interests recognized by this Court").  The clear implication of <u>McCurdy</u> is that a constitutional

right to familial relationships is the exception rather than the rule; a singular characteristic of the

<u>sui generis</u> relationship that exists between parents and their minor children.[13] <u>Id.</u>

---

[12] Neither <u>Pahle</u> nor <u>Brodlic</u> discuss the possibility that the expansive application of § 1983 in
<u>Bailey</u> may be limited to the relationship between parents and their minor children.  <u>Pahle</u>, was decided
before <u>McCurdy</u>, and, although <u>Brodlic</u> was decided after <u>McCurdy</u> the court makes no mention of the
Third Circuit's decision.

[13] In <u>McCurdy</u> the Third Circuit also held that "the Due Process Clause only protects against
deliberate violations of a parent's fundamental rights -- that is, where the state action at issue was
specifically aimed at interfering with protected aspects of the parent-child relationship." <u>McCurdy</u>, 352
F.3d at 830.  Consequently, even if the plaintiff in <u>McCurdy</u> possessed a constitutional interest in the
relationship with his adult child, the defendant police officer's actions in shooting and killing the child
did not violate the parent's rights because the defendant's actions were not directed at the parent-child
relationship. <u>McCurdy</u>, 352 F.3d at 827-28.

While the Supreme Court has recognized constitutional protection for "rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion," the Court has never sanctioned constitutional protection of consortium. Id. (citations omitted).  To find a constitutional interest in the relationship between spouses, the court in Pahle relied primarily on Supreme Court cases regarding privacy in the marital relationship to conclude that "marital integrity and spousal association" implicate constitutional due process rights. Pahle, 227 F. Supp. 2d at 382 (quoting Maynard v. Hill, 125 U.S. 190, 205 (1888), and Griswold v. Connecticut, 381 U.S. 479, 486 (1965)).  However, constitutional protection of privacy is not equivalent to constitutional protection of the relationship; nor is consortium equivalent to marriage.[14] Niehus v. Liberio, 973

---

In this case, although I find that there exists no constitutional right to consortium, and grant Defendants' motion for summary judgment on that basis, I also find that such relief is nevertheless warranted because there is no evidence in the record to suggest that Payne's actions in arresting Plaintiff were directed toward the spousal relationship between Judith and Gilberto Pagan.

[14] In Niehus, Judge Posner, writing for the Seventh Circuit, noted, among other things:

consortium is not a synonym for marriage. It is the name of the sexual and other services (apart from financial support) that spouses render to each other. Tribble v. Gregory, 288 So.2d 13, 16 (Miss. 1974). A loss of consortium can therefore be as minor and transient as a wife's losing a month's help from her husband in mowing the lawn and washing the dishes and grooming the cat, cf. Blansit v. Hyatt Corp., 874 F.2d 1015, 1018 (5th Cir. 1989) (raking leaves); Orlando Regional Medical Center, Inc. v. Chmielewski, 573 So.2d 876, 881 (Fla. App. 1990) (dancing), and as major as the loss of all spousal services consequent upon an injury that renders the injured spouse a human vegetable.

Deprivations of the lesser services comprehended in the portmanteau term "consortium" are not deprivations of liberty within the restricted meaning that the term bears in the Constitution. The right to a husband's assistance in raking leaves is not a liberty protected by the Fourteenth Amendment. But Mrs. Niehus does not ask us to confine the constitutional right of consortium to the greater deprivations. She wants us to rule that consortium is liberty, period. We decline the invitation. Nor are we eager on our own to fix a point on the scale from the smallest to the largest loss of consortium and say that above that point the Constitution provides a remedy but below it not.

973 F.2d at 533-34 (7th Cir. 1992).

F.2d 526, 533-34 (7th Cir. 1992).  Moreover, the Supreme Court itself has warned that it has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citations omitted); McCurdy v. Dodd, 352 F.3d at 825-26 ("[I]n § 1983 cases grounded on alleged parental liberty interests, we are venturing into the murky area of unenumerated constitutional rights.").

Based on the convincing opinions of other courts in this circuit and out, as well as my own certainty, I find that there exists no constitutional interest in the consortium of one's spouse and that such a claim cannot sustain an action pursuant to § 1983.  Accordingly, Defendants' motion for summary judgment on Judith Pagan's per quod claim for loss of consortium, derived from Plaintiff's § 1983, claim is granted.[15]

## C.    Plaintiff's Common Law Claims

Finally, Defendants argue that Plaintiff's common law tort law claims are barred by operation of N.J. Stat. Ann. § 59:5-2.[16]  That statute insulates public entities and public

---

[15] Judith's loss of consortium claim is presented in Count Six of Plaintiffs' Complaint, which specifically incorporates by reference the Complaint's preceding Counts.  Those Counts include: Count One, in which Plaintiff asserts a § 1983 claim against Payne; Count Two, in which Plaintiff alleges a common law assault claim against Payne; Count Three, in which Plaintiff alleges negligence against Payne; Count Four, in which Plaintiff alleges municipal liability for his § 1983 claim against Raritan and Raritan Police; and Count Five, in which Plaintiff alleges intentional and/or negligent infliction of emotional distress against all Defendants.  In light of the broad incorporating language in Count Six, I must construe Judith's loss of consortium claim to allege Plaintiff's common law tort claims as alternative anchors to which she moors her per quod claim, in conjunction with Plaintiff's § 1983 claim. Defendants do not address these alternative foundations for Judith's loss of consortium claim. Consequently, because Plaintiff's common law tort claims survive this motion for summary judgment, see infra, § C, at pg. 20, Judith's loss of consortium claim based thereon necessarily survives as well.

[16] Specifically, N.J. Stat. Ann. § 59:5-2 states:

Neither a public entity nor a public employee is liable for:
a. An injury resulting from the parole or release of a prisoner or from the terms and conditions of

employees in New Jersey from liability arising out of injuries caused by a person resisting or

evading arrest. N.J. Stat. Ann. § 59:5-2(b)(3).  Defendants argue that since Plaintiff's injuries

were sustained as a result of his resistence to Payne's effort to arrest him, Defendants are

immune from liability and Plaintiff's common law claims must fail.

     As I have indicated with respect to Plaintiff's excessive force allegation, the facts of this

case are in dispute.  On one hand, Plaintiff and his witnesses testified that Plaintiff never resisted

Payne's orders.  Indeed, Plaintiff and his witnesses testified that Plaintiff had no opportunity to

do so because Payne rushed Plaintiff without provocation, and took him to the ground by the

arm.  On the other hand, Payne and Ege testified that Plaintiff initially failed to comply with

Payne's commands to place his hands behind his back and submit to arrest.  However, they

characterized this initial resistence by Plaintiff as merely "passive," and not entailing any active

force.  More important is their testimony describing the fall that they allege resulted in Plaintiff's

injuries.  Both Payne and Ege alleged the fall was caused by Vivian's interference as Payne

ultimately handcuffed Plaintiff, and not Plaintiff's resistence.

     Accordingly, construing the facts in the light most favorable to Plaintiff, I cannot

conclude that Plaintiff's injuries were the result of his resistence to Payne's arrest efforts.

Consequently, the statutory immunity provided for in N.J. Stat. Ann. § 59:5-2(b)(3), is

inapplicable and Defendants' motion for summary judgment on this issue is denied.

---

his parole or release or from the revocation of his parole or release;
b. any injury caused by:
(1) an escaping or escaped prisoner;
(2) an escaping or escaped person;
(3) a person resisting arrest or evading arrest;
(4) a prisoner to any other prisoner ; or
c. any injury resulting from or caused by a law enforcement officer's pursuit of a person.

**III.     CONCLUSION**

For the forgoing reasons, Defendants' motion for summary judgment on Plaintiff's

Complaint is granted in part and denied in part.  Specifically, Plaintiff's § 1983 claim against

Payne, and his state common law claims against the particular Defendants named in the various

Counts may proceed, as may Judith's loss of consortium claim based on those common law

claims; however, Plaintiff's § 1983 claim against Raritan and Raritan Police is dismissed, as is

Judith Pagan's loss of consortium claim based on Plaintiff's § 1983 claim.

An appropriate Order shall follow.____

_____          /s/   Freda L. Wolfson
                                                The Honorable Freda L. Wolfson
                                                United States District Judge

Date: August 23, 2006.

22